UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE 650 FIFTH AVENUE AND
RELATED PROPERTIES

Case No. 08 Civ. 10934(KBF) and All
Member and Related Cases

**MEMORANDUM OF LAW IN SUPPORT OF
JUDGMENT CREDITOR PLAINTIFFS' JOINT SUPPLEMENTAL
MOTION FOR SUMMARY JUDGMENT PURSUANT TO 28 U.S.C. § 1610(a)(7)**

STROOCK & STROOCK & LAVAN LLP
Curtis C. Mechling
James L. Bernard
Benjamin Weathers-Lowin
Monica Hanna
Patrick N. Petrocelli
Nathan H. Stopper
New York, New York 10038
Tel: (212) 806-5400
*Attorneys for the Greenbaum, Acosta, Beer
and Kirschenbaum Plaintiffs*

*Additional counsel on signature page*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ....................................................................................................... ii

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ........................................................................................................................2

      A.    The Properties Remaining to Be Adjudicated ........................................................4

SUMMARY JUDGMENT STANDARD.....................................................................................7

ARGUMENT ..............................................................................................................................7

POINT I
SUMMARY JUDGMENT IS WARRANTED AS TO PLAINTIFFS'
TURNOVER CLAIMS FOR THE ALAVI-ONLY PROPERTIES
PURSUANT TO FSIA SECTION 1610(a)(7) ............................................................................7

      A.    The Alavi-Only Properties Are Used for Commercial Activity .............................9

CONCLUSION...........................................................................................................................15

# TABLE OF AUTHORITIES

Page(s)

CASES

*EM Ltd. v. Republic of Argentina*,
    389 F. App'x 38 (2d Cir. 2010) .........................................................................10

*Ford Motor Co. v. Russian Fed'n*,
    09 CIV. 1646 (JGK), 2010 WL 2010867 (S.D.N.Y. May 18, 2010) ....................10

*In re Terrorist Attacks on September 11, 2001*,
    538 F.3d 71 (2d Cir. 2008) ...........................................................................12, 13

*Joseph v. Office of Consulate General of Nigeria*,
    830 F.2d 1018 (9th Cir. 1987) ...........................................................................10

*Kaggen v. IRS*,
    71 F.3d 1018 (2d Cir. 1995) ................................................................................9

*Kato v. Ishihara*,
    360 F.3d 106, 110 (2d Cir. 2004)) ....................................................................10

*Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ............................................................................................7

*Republic of Argentina v. Weltover, Inc*,
    504 U.S. 607 (1992) ................................................................................. passim

STATUTES

28 U.S.C. § 1610(a)(7) ................................................................................. passim

28 U.S.C. §1610(g) ..................................................................................1, 2, 3

28 U.S.C.A. § 1603(d) ...................................................................................9, 13

§ 201(a), Pub.L. No. 107-297, Title II, 116 Stat. 2337 (2002) ......................................3

FED. R. CIV. P. 56(a) ..........................................................................................7

FED. R. EVID. 201 ...............................................................................................9

OTHER AUTHORITIES

31 C.F.R. 560 ...............................................................................................2, 8, 9

31 C.F.R. § 560.304 ..........................................................................................8, 9

Exec. Order No. 13,599, 77 Fed. Reg. 26 (Feb. 6, 2012) ............................................................8, 9

H.R. REP. NO. 94-1487 (1976) ..............................................................................................10, 11

The judgment creditor plaintiffs herein previously designated as the Greenbaum, Acosta, Beer, Kirschenbaum, Heiser, Havlish, Peterson, and Rubin Plaintiffs (collectively, "Plaintiffs")[1] respectfully submit this memorandum of law in support of their Joint Supplemental Motion for Summary Judgment pursuant to 28 U.S.C. § 1610(a)(7), per Rule 56 of the Federal Rules of Civil Procedure, as to defendant the Alavi Foundation ("Alavi").

## PRELIMINARY STATEMENT

This Court recently granted summary judgment to the Government, ruling that properties owned by Alavi and other defendants at issue in this consolidated proceeding are subject to forfeiture, but severing the proceeding as to properties owned exclusively by Alavi.  Order, dated September 12, 2013, ECF No. 851; Opinion and Order, dated September 16, 2013, ECF No. 865, at 8 n.14 ("Forfeiture Order").  Plaintiffs' initially moved for summary judgment with respect to their turnover claims against defendants Alavi, Assa Corp. and Assa Co. Ltd. (together, "Assa"), and 650 Fifth Avenue Company ("650 Fifth Ave. Co." and, collectively with Assa and Alavi, the "Defendants"), and while some of the claims that were the subject of that motion include these Alavi-exclusive properties, one claim did not.  *See* Memorandum of Law in Support of Judgment Creditor Plaintiffs' Joint Motion for Summary Judgment, dated September 17, 2013, ECF No. 871 ("Plaintiffs' First SJ Motion"), at 10 n.11.

More specifically, Plaintiffs are entitled to turnover of any and all property owned by any of the Defendants, including seven real properties and three bank accounts held in Alavi's name exclusively (the "Alavi-Only Properties"), pursuant to section 1610(g) of the Foreign Sovereign

---

[1]   A schedule of Plaintiffs and their respective claims is annexed to the Declaration of James L. Bernard in Support of Judgment Creditor Plaintiffs' Joint Motion for Summary Judgment, dated September 17, 2013, ECF No. 870, ("Bernard Decl. I") as Exhibit 1.

Immunities Act ("FSIA") and section 201(a) of the Terrorism Risk Insurance Act of 2002 ("TRIA").  This supplemental motion for summary judgment, therefore, addresses only Plaintiffs' specific relief under FSIA section 1610(a)(7) as to the Alavi-Only Properties.  As demonstrated below, Plaintiffs are entitled to turnover of the Alavi-Only Properties under this section of the FSIA as well.

## BACKGROUND

As stated on the record on September 11, 2013, and by written orders dated September 12, 2013, and September 16, 2013, this Court granted summary judgment to the Government and ruled that most of the Defendants' properties at issue in this consolidated proceeding are subject to forfeiture.[2]  Order, dated September 12, 2013, ECF No. 851, at 1; Forfeiture Order at 2, 82.  In doing so, the Court found that: (1) Defendants, including Alavi, acted on behalf of the Government of Iran ("Iran") in violation of the regulations of the Office of Foreign Assets Controls ("OFAC"), 31 C.F.R. part 560 ("31 C.F.R. 560"), and the International Emergency Economic Powers Act ("IEEPA"); and (2) Alavi knew that Assa Corp. was a front company for Bank Melli Iran ("Bank Melli") and Iran.  *Id.* at 5-7, 31, 33, 40-41, 49, 51-58, 71.

On September 17, 2013, Plaintiffs filed a summary judgment motion (Plaintiffs' First SJ Motion), against the Defendants on several grounds.  *See* Plaintiffs' First SJ Motion at 17.  In particular, Plaintiffs moved for summary judgment against Alavi pursuant to FSIA sections 1610(a)(7) and 1610 (g), and TRIA section 201(a).  *See id.*  Plaintiffs' First SJ Motion seeks turnover of all of Alavi's assets, including the Alavi-Only Properties under FSIA section 1610(g)

---

[2]    The Court reserved judgment as to seven real properties owned exclusively by Alavi, which are among the assets that are the subject of this supplemental motion.  *See* Forfeiture Order at 8, 82.

and TRIA section 201(a), as both sections permit the attachment and execution of *all* assets of a liable party.[3]

However, for many of the same reasons that the Court severed Alavi's seven real properties in the Forfeiture Order, Plaintiffs' First SJ Motion sought limited relief under FSIA section 1610(a)(7) and intentionally omitted discussion of the use of the Alavi-Only Properties. *See* Plaintiffs' First SJ Motion at 10, n.11.  As ordered by the Court, Plaintiffs now address the disposition of the Alavi-Only Properties under FSIA section 1610(a)(7) and seek the full relief to which they are entitled thereunder.  *See* Order, dated September 25, 2013, ECF No. 909, at 1.

---

[3]   Section 1610(g) states in relevant part:

(g)  Property in Certain Actions.—

(1)  In general.— . . . [T]he property of a foreign state against which a judgment is entered under section 1605A, and the property of an agency or instrumentality of such a state, including property that is a separate juridical entity or is an interest held directly or indirectly in a separate juridical entity, is subject to attachment in aid of execution, and execution, upon that judgment as provided in this section, regardless of—

(A)  the level of economic control over the property by the government of the foreign state;

(B)  whether the profits of the property go to that government;

(C)  the degree to which officials of that government manage the property or otherwise control its daily affairs;

(D)  whether that government is the sole beneficiary in interest of the property; or

(E)  whether establishing the property as a separate entity would entitle the foreign state to benefits in United States courts while avoiding its obligations.

28 U.S.C. §1610(g)(1).

Section 201 of TRIA states in relevant part:

Notwithstanding any other provision of law ... in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section [1605A or] 1605(a)(7) of title 28 United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy any judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA §§ 201(a), Pub.L. No. 107-297, Title II, 116 Stat. 2337 (2002).

A.      **The Properties Remaining to Be Adjudicated**

Alavi owns seven real properties remaining at issue:

1.      The real property and appurtenances located at 2313 South Voss Road, Houston, Texas 77057 (the "Texas Property");

2.      The real property and appurtenances located at 55-11 Queens Boulevard, Queens, New York 11377, Block 1325 Lots 1, 6, 7 and 8 (the "New York Property");

3.      The real property and appurtenances located at 4836 Marconi Avenue, Carmichael, California 95608 (the "California Property");

4.      The real property and appurtenances located at 4204 Aldie Road, Catharpin, Virginia 20143-1133 ("Virginia Property No. 1");

5.      The real property and appurtenances located at 4300 Aldie Road, Catharpin, Virginia ("Virginia Property No. 2" and, together with Virginia Property No. 1, the "Virginia Properties");

6.      The real property and appurtenances located at 7917 Montrose Road, Rockville, Maryland 20854 ("Maryland Property No. 1"); and

7.      The real property and appurtenances located at 8100 Jeb Stuart Road, Rockville, Maryland 20854 ("Maryland Property No. 2" and, together with Maryland Property No. 1, the "Maryland Properties").

See Amended Complaint of the United States of America, dated November 16, 2009, ECF No. 51, at 3-4; Forfeiture Order at 8, n.14.

Five of Alavi's properties, the Texas Property, the New York Property, the California Property, and the Maryland Properties (collectively, the "Usage Agreement Properties") are leased pursuant to Usage Agreements, which are, according to their terms, "deemed to be … contract[s]," to house educational and religious organizations.[4]  See Judgment Creditor Plaintiffs'

---

[4]      Some of the Usage Agreements at issue in this matter are not executed.  See Declaration of James L. Bernard in Support of Judgment Creditor Plaintiffs' Joint Supplemental Motion for Summary Judgment ("Bernard Decl. II"), Ex. 3 (2007 Usage Agreement between Alavi and the Razi School); Bernard Decl. II, Ex. 6 (2006 Usage Agreement between Alavi and the Islamic Education Center, Inc ).  An earlier version of one of these unexecuted Agreements, and a "Master Agreement" referencing the other unexecuted Usage Agreement, are, however, executed and we therefore have no reason to believe that the current versions of the Usage Agreements are not controlling, even though the more recent Agreements are not executed.  See Bernard Decl.
(Continued on next page)

Statement of Undisputed Material Facts in Support of Supplemental Motion for Summary Judgment ("SUF") ¶¶ 1, 9, 10, 25, 34.  Alavi lists the depreciation in value of these properties under Part I, Line 19 of its 2011 Form 990-PF tax statement.  *See* SUF ¶¶ 8, 24, 33, 45.  While the Usage Agreements do not require the tenant organizations to pay Alavi rent in the traditional sense, the parties are bound as landlord and tenant by, *inter alia*, "good and valuable consideration, the receipt and sufficiency of which is … acknowledged [in the Agreements],"[5] and such consideration confers significant and undisputed financial benefits on Alavi, as explained further below.  *See* SUF ¶¶ 12, 18, 26, 36.

Under the Usage Agreements, the tenant organizations undertake a number of obligations that would otherwise be the responsibility of a landlord, thus directly benefitting Alavi as owner of these properties.  On behalf of Alavi, the tenants assume responsibility for: (1) maintaining insurance on the leased facility on behalf of themselves and Alavi; (2) paying "any taxes and assessments that may be charged or imposed upon the [facility];" (3) maintaining and making "all major and minor repairs to the [facility];" and (4), in the cases of the Texas and California Properties, paying "utility charges for water, sewer, gas, heat, electricity, power, air conditioning, telephone and other utility services to be used at the [facility]."  *See* SUF ¶¶ 3-6, 14-16, 20-22, 28-31, 38-40.  In addition, Alavi receives the full and complete benefit of any improvements made by the tenant organizations, as any alteration shall "be and become the absolute property of [Alavi] and may not be removed by [the tenant organization]."  *See* SUF ¶¶ 7, 17, 23, 32, 41.

---

II, Ex. 4 (2006 Usage Agreement between Alavi and the Razi School); Bernard Decl. II, Ex. 7 (Master Agreement between the Muslim Community School, the Islamic Education Center, Inc., and Alavi).

[5]    While the Usage Agreement for the Texas Property does not expressly state that it was entered into for consideration, all Usage Agreements are substantially similar and, with a few minor exceptions, impose the same obligations upon the tenant organizations.

The Virginia Properties are leased to private individuals for consideration in the form of traditional rent payments. *See, e.g.*, SUF ¶ 46. Alavi pays tax on the Virginia Properties, has received numerous enquiries as to the availability for purchase of Virginia Property No. 2 – and even drafted a Sales Agreement for one enquirer – and has obtained appraisals of their value. *See, e.g.*, SUF ¶ 48-55. Additionally, Virginia Property No. 1 is listed as a "land investment" under Part II, Line 11 of Alavi's 2011 Form 990-PF tax statement. *See* SUF ¶ 47.

The remainder of the Alavi-Only Properties at issue in this proceeding are three bank accounts:

1. Account No. 3802032201 at Sterling National Bank, a "Sterling Silver Small Business Checking Account" (the "<u>Small Business Account</u>");

2. Account No. 3802032216 at Sterling National Bank, a "Sterling Silver Money Market Business Account" (the "<u>Money Market Account</u>"); and

3. Account number 3852524414 at Sterling National Bank, a "Pro Checking Account" (the "<u>Pro Checking Account</u>").

*See* Amended Complaint of the United States of America, dated November 16, 2009, ECF No. 51, at 4-5. Alavi used the Small Business Checking Account to receive at least one payment from 650 Fifth Ave. Co., issue student loans, disburse 401(k) and payroll payments to its employees, and make tax payments. *See, e.g.*, SUF ¶¶ 56-65. Alavi used the Money Market Account to receive regular distributions of hundreds of thousands of dollars each from 650 Fifth Ave. Co., and a life insurance credit for $1.5 million. *See, e.g.*, SUF ¶¶ 66-71. Alavi used the Pro Checking Account to receive substantial regular deposits totaling, at a minimum, almost a million dollars, and also to make at least one payment to a credit card company. *See, e.g.*, SUF ¶¶ 72-77. Finally Alavi regularly transferred hundreds of thousands of dollars from the Money Market Account – money that undoubtedly came from distributions from 650 Fifth Ave. Co. – to

both the Small Business Checking Account and the Pro Checking Account.  *See, e.g.*, SUF ¶¶ 78-84.

As discussed below, these undisputed facts demonstrate that the Alavi-Only Properties are used for commercial activity within the meaning of the FSIA, and are therefore subject to attachment and execution under FSIA section 1610(a)(7).

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts," and set forth "specific facts showing that there is a genuine issue for trial."  *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

## ARGUMENT

## POINT I

## SUMMARY JUDGMENT IS WARRANTED AS TO PLAINTIFFS' TURNOVER CLAIMS FOR THE ALAVI-ONLY PROPERTIES PURSUANT TO FSIA SECTION 1610(a)(7)

Property in the United States is subject to attachment and execution pursuant to FSIA section 1610(a)(7) if: (1) it is the property of a foreign state; (2) the property is used for a commercial activity; and (3) the judgment relates to a claim for which the foreign state is not immune under FSIA sections 1605A or 1605(a)(7) (as such section was in effect on January 27, 2008).  28 U.S.C. § 1610(a)(7).[6]  Based on the undisputed facts presented to this Court in

---

[6]   Section 1610(a)(7) states in relevant part:

(a)  The property in the United States of a foreign state, as defined in section 1603 (a) of this chapter, used for a
      commercial activity in the United States, shall not be immune from attachment in aid of execution, or from
(Continued on next page)

Plaintiffs' First SJ Motion and those presented herein, all three elements are met as to all of Alavi's properties.

Plaintiffs incorporate by reference all arguments made in Plaintiffs' First SJ Motion, but provide the following brief summary as to the first and third elements of section 1610(a)(7). First, this Court held in the Forfeiture Order that Alavi acted on behalf of Iran in a multitude of ways, finding, *inter alia*, that Alavi shielded and concealed Iranian assets, carried out orders of officials and representatives of Iran and its Supreme Leader, and engaged in business with Assa, despite knowing that Assa was a front company for Bank Melli and Iran.  Forfeiture Order at 6-7, 31, 33, 40-41, 49, 51-58, 71.  As such, Alavi necessarily falls within (1) the OFAC regulatory definition of "Iran," as defined by 31 C.F.R. 560,[7] and (2) the definition of the "Government of Iran," promulgated in Executive Order 13599 ("E.O. 13599"),[8] because both authorities equate entities "acting for or on behalf of" Iran with Iran.  Exec. Order No. 13,599, 77 Fed. Reg. 26 (Feb. 6, 2012); *see also* 31 C.F.R. § 560.304.  Moreover, this Court has already held that the

---

execution, upon a judgment entered by a court of the United States or of a State after the effective date of this Act, if—

  (7) the judgment relates to a claim for which the foreign state is not immune under section 1605A or section 1605 (a)(7) (as such section was in effect on January 27, 2008), regardless of whether the property is or was involved with the act upon which the claim is based.

28 U.S.C. §1610(a)(7).

[7]  31 C.F.R. 560 defines "Iran" broadly to include:

  (a) the state and Government of Iran, as well as any political subdivision, agency or instrumentality thereof, including the Central Bank of Iran; (b) Any person owned or controlled directly or indirectly by the foregoing; (c) Any person to the extent that such person is, or has been, since the applicable effective date, *acting or purporting to act directly or indirectly on behalf of any of the foregoing.*

31 C.F.R. § 560.304 (emphasis added).

[8]  Executive Order 13599 also defines the "Government of Iran" broadly to include:

  [a]ny political subdivision, agency, or instrumentality thereof, . . . and any [individual or entity] owned or controlled by, *or acting for or on behalf of,* the Government of Iran."

Exec. Order No. 13,599, 77 Fed. Reg. 26 (Feb. 6, 2012) (emphasis added).

terms of 31 C.F.R. 560 and E.O. 13599 can be used to define a foreign state under the FSIA, so the Alavi-Only Properties are properties of Iran and the first element of FSIA section 1610(a)(7) is satisfied. Second, this Court may take judicial notice of Plaintiffs' judgments under FSIA section 1605A and/or former section 1605(a)(7) against, among others, Iran, based upon acts of terrorism sponsored by Iran, and satisfaction of the third element under FSIA section 1610(a)(7) is therefore undisputed.[9] *See* FED. R. EVID. 201; *Kaggen v. IRS*, 71 F.3d 1018, 1020 (2d Cir. 1995).

The only element of FSIA section 1610(a)(7) remaining for consideration, therefore, is whether the Alavi-Only Properties are used for commercial activity. The undisputed facts demonstrate such commercial use.

**A.    The Alavi-Only Properties Are Used for Commercial Activity**

The FSIA's definition of "commercial activity" states in relevant part that "the commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C.A. § 1603(d). In the leading case addressing commercial activity, *Republic of Argentina v. Weltover, Inc*, 504 U.S. 607 (1992), the Supreme Court held that: "[T]he question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* at 614 (emphasis in original). Thus, if a foreign government acts as a private player in a market, as opposed to a regulator thereof, its actions are

---

[9]    Exhibit 1 annexed to Bernard Decl. I delineates the specific judgments held by each of the Plaintiff groups. Copies of Plaintiffs' judgments, and the opinions underlying those judgments, are also annexed to Bernard Decl. I as Exhibits 2 through 24.

commercial for purposes of the FSIA.  *Id.; see also EM Ltd. v. Republic of Argentina*, 389 F.

App'x 38, 43-44 (2d Cir. 2010).  And when a foreign sovereign acts as a private player,

"[e]ngaging in a commercial act does not require the receipt of fair value, or even compliance

with the common-law requirements of consideration."  *Weltover*, 504 U.S. at 616.  Finally,

courts have held that "the commercial activity exception applies when a sovereign exercises only

those powers that can also be exercised by private citizens, as distinct from those powers peculiar

to sovereigns."  *Ford Motor Co. v. Russian Fed'n*, 09 CIV. 1646 (JGK), 2010 WL 2010867, at

*3 (S.D.N.Y. May 18, 2010) (internal quotations omitted) (citing *Saudi Arabia v. Nelson*, 507

U.S. 349, 360 (1993); *Kato v. Ishihara*, 360 F.3d 106, 110 (2d Cir. 2004)).

Both the legislative history of the FSIA and relevant precedent confirm that the leasing of

real property falls within the definition of commercial activity.  *See* H.R. REP. NO. 94-1487, at 16

(1976) (stating that a foreign government's leasing of property would be included in the

definition of commercial activity); *see also, e.g., Joseph v. Office of Consulate Gen. of Nigeria*,

830 F.2d 1018, 1024 (9th Cir. 1987) (finding the leasing of real property by the consulate of a

foreign sovereign to constitute commercial activity); *Ford Motor*, 2010 WL 2010867, at *3

(holding the leasing of vehicles by a foreign sovereign to be commercial activity).

Thus, the Virginia Properties are used for commercial activity because Alavi leases those

properties to private individuals for rent.  *See, e.g.*, SUF ¶ 46.  In fact, Alavi lists Virginia

Property No. 1 as a "land investment" under Part II, Line 11of its 2011 Form 990-PF tax

statement.  SUF ¶ 47.  In addition, much like its undisputed commercial use of real property it

owns in part at 650 Fifth Avenue, New York, New York (the "Building"),[10] Alavi pays tax on

---

[10]   Alavi has undisputedly used the Building in commercial activity by, *inter alia*, leasing the real property to
      private parties.  In fact, Alavi did not contest this fact when Plaintiffs sought similar relief under FSIA section
      1610(a)(7) as to the Building in Plaintiffs' SJ Motion I.  *See generally* Alavi Foundation's and 650 Fifth
(Continued on next page)

10

the Virginia Properties, has received numerous enquiries as to the availability for purchase of the Virginia Properties, has drafted a Sales Agreement for Virginia Property No. 2, and has obtained appraisals of their value, further demonstrating use for commercial activity.  *See, e.g.*, SUF ¶¶ 48-55.  Certainly leasing real property – an action specifically recognized by the FSIA's legislative history as constituting commercial use – and making investments are "the type of actions by which a private party engages in 'trade and traffic or commerce," and thus demonstrate the Virginia Properties' commercial use.  H.R. REP. NO. 94-1487, at 16 (1976); *Weltover*, 504 U.S. at 614.

The Usage Agreement Properties are also used for commercial activity, and the terms of the Usage Agreements constitute undisputed evidence of commercial use.  Fundamentally, the Usage Agreements are legally binding contracts that confer significant financial benefits on Alavi, and are entered into for "good and valuable consideration, the receipt and sufficiency of which is … acknowledged [in the Agreements]."  *See* SUF ¶¶ 1, 9, 10, 12, 18, 25-26, 34, 36. Although the tenant organizations do not pay rent to Alavi per se, they assume a number of Alavi's liabilities in exchange for the right to use the properties, thus relieving Alavi of substantial financial responsibilities and indirectly compensating Alavi for the leased real property.  As described above, Alavi avoids the following financial costs by passing them along to the tenants of the Usage Agreement Properties in lieu of traditional rent: (1) insurance coverage of facilities; (2) any taxes and assessments; (3) the costs of all major and minor repairs to the facilities; and (4), for those tenant organizations at the Texas and California Properties, all utility charges.  *See* SUF ¶¶ 3-6, 14-16, 20-22, 28-31, 38-40.  In addition, Alavi retains the

---

Avenue Company's Memorandum of Law in Opposition to the Private Plaintiffs' Motion for Summary Judgment, dated September 19, 2013, ECF No. 879.

benefit of any improvements the tenant organizations make to the Usage Agreement Properties. Significantly, the leasing of the Usage Agreement Properties under these terms constitutes commercial activity, independent of the actual value of the consideration Alavi receives or how the arrangement compares to fair market rent. *See Weltover*, 504 U.S. at 614.

Nevertheless, at least one tenant organization has argued that the use of one of the Usage Agreement Properties is charitable in nature, as opposed to commercial. *See* Letter from Saeid B. Amini to the Hon. Katherine B. Forrest, dated September 30, 2013, ECF No. 923 ("IEC Letter").

We acknowledge that the Second Circuit Court of Appeals has held that "donations to charity are not part of the trade and commerce engaged in by a 'merchant in the marketplace.'" *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71, 92 (2d Cir. 2008) (quoting *De Letelier v. Republic of Chile*, 748 F.2d 790, 794 (2d Cir. 1984)). As is shown below, however, the holding of *Terrorist Attacks* does not apply to the facts of this case. The Usage Agreement Properties are used for commercial activity as a matter of law and are subject to turnover.

As a threshold matter, the Court's "first task is to identify what particular conduct in this case is relevant." *Id.* (quoting *Texas Trading & Milling Corp. v. Fed. Republic of Nigeria*, 647 F.2d 300, 308 (2d Cir. 1981)). Here, the particular relevant conduct is the leasing of real property—even at below fair market consideration. *See Weltover*, 504 U.S. at 616. Such conduct was not addressed by the Second Circuit in *In re Terrorist Attacks*, which dealt with the narrow issue of outright chartable donations of money and concluded that "giving away money" is not a commercial activity. 538 F.3d at 92 ("The alleged conduct itself-*giving away money*-is not a commercial activity." (emphasis added)). Contracting for the use of valuable real property, even at reduced commercial return, is not "giving away money," or a donation to charity, and

therefore the holding in *In re Terrorist Attacks* does not control.  Moreover, as section 1603(d) makes clear, the *purpose* of the activity is irrelevant to its commercial character; despite the purported philanthropic, educational, and religious objectives of Alavi and the tenant organizations, it is the commercial nature of the use—leasing—of these real properties that controls.  28 U.S.C. § 1603(d); *see also Weltover*, 504 U.S. at 617 ("it is irrelevant *why* [the foreign sovereign] participated in the bond market in the manner of a private actor; it matters only that it did so.").

Alavi and one tenant organization's purported charitable objectives and arrangements cannot overcome the clear commercial character of the Maryland Properties.  According to the tenant of the Maryland Properties, the Islamic Education Center of Maryland (the "IEC"), Alavi's purchase and taking title of the Maryland Properties was akin to a permanent charitable gift to the local community members that had initially purchased the properties, which were intended to be used strictly for a charitable purpose.  In early 1981, community members purchased the Maryland Properties and constructed a mosque and school with the intent of permanently dedicating the Maryland Properties under the Islamic "Waqf" concept, which is an "inalienable endowment in Islamic jurisprudence . . . [and] an unconditional and permanent dedication of property" in which God is considered the owner.  IEC Letter at 2, 14.  In July 1981, Alavi, then known as the Mostazafan Foundation, paid off the IEC's mortgage and took title of the Maryland Properties.  *Id.* at 3.  However, according to the IEC, title to the Maryland Properties was transferred to Alavi below fair market value, which somehow negated the transfer of ownership and maintained the charitable purpose of the properties under the Islamic "Waqf" concept intended by the original purchasers.  *Id.*

But, even per the minimal explanation supplied by the IEC from the Encyclopedia of Islam, "When a Muslim makes something Waqf, 'it ceases to be his property and neither he nor anybody else can either gift it or sell it to any other entity.'" *Id.* at 14. Therefore, the IEC could not have both transferred title of the Maryland Properties to Alavi *and* maintained the Waqf dedication, and thereby the claimed charitable purpose of the properties, because such a transfer is prohibited by the Islamic tenets the IEC purports to rely upon. By acknowledging Alavi as the rightful titleholder, the IEC undermines its own assertion of the Maryland Properties' Waqf purpose. Further, the IEC admits to having "spent millions of dollars in renovations and upkeep," which ultimately benefit Alavi, the titleholder, in exchange for the use of the Maryland Properties.

In short, the record undisputedly demonstrates that the Usage Agreement Properties are used for commercial activity given the nature of the financial arrangement between Alavi and the tenants of the properties.

Finally, the record demonstrates that Alavi's three bank accounts are undisputedly used for commercial activity. First, Alavi used the Small Business Checking Account to receive at least one payment from 650 Fith Ave., issue student loans, to make 401(k) and payroll payments to its employees, and to make tax payments. *See, e.g.*, SUF ¶¶ 56-65. Second, Alavi used the Money Market Account to receive regular distributions totaling millions of dollars from 650 Fifth Ave. Co., which is an undisputed real estate holding company engaged in commercial activity, and $1.5 million from a life insurance company. *See, e.g.*, SUF ¶¶ 66-71. Third, it used the Pro Checking Account to receive deposits of, at a minimum, almost a million dollars, and to make at least one credit card payment. *See, e.g.*, SUF ¶¶ 72-77. Fourth, the money received as distributions from 650 Fifth Ave. Co. flowed freely between all three accounts, as Alavi

14

regularly transferred hundreds of thousands of dollars from the Money Market Account to both the Small Business Checking Account and the Pro Checking Account.  *See, e.g.*, SUF ¶¶ 78-84. Receiving payments and distributions from a real estate holding company, as well as proceeds from a life insurance company, charging interest on loans, and making payments to employees, credit card companies, and taxing authorities are all actions taken in the "manner of a private player within [a market]," and thus constitute commercial activity.  The commercial use of these accounts is especially clear as Alavi used the three accounts to shuffle distributions received from 650 Fifth Ave. Co. from one place to another.

In sum, the Alavi-Only Properties are used for commercial activity.  This fact combined with the previously established facts that (1) Defendants acted on behalf of, and therefore are, Iran, and (2) Plaintiffs hold unsatisfied judgments against Iran under FSIA sections 1605A and/or 1605(a)(7), compels the conclusion that Plaintiffs are entitled to relief under FSIA section 1610(a)(7) and to obtain execution on, and turnover of, the Alavi-Only Properties under FSIA section 1610(a)(7).

## CONCLUSION

For the foregoing reasons, Judgment Creditor Plaintiffs' Joint Supplemental Motion for Summary Judgment Pursuant to 28 U.S.C. § 1610(a)(7) should be granted in its entirety, and the Court should enter judgment determining that, pursuant to section 1610(a)(7) of the FSIA, the Plaintiffs are entitled to turnover of:

1. The real property and all appurtenances thereto located at 2313 South Voss Road, Houston, Texas 77057;

2. The real property and appurtenances thereto located at 55-11 Queens Boulevard, Queens, New York 11377, Block 1325 Lots 1, 6, 7 and 8;

3. The real property and appurtenances thereto located at 4836 Marconi Avenue, Carmichael, California 95608;

15

4.      The real property and appurtenances thereto located at 4204 Aldie Road, Catharpin, Virginia 20143-1133;

5.      The real property and appurtenances thereto located at 4300 Aldie Road, Catharpin, Virginia;

6.      The real property and appurtenances thereto located at 7917 Montrose Road, Rockville, Maryland 20854;

7.      The real property and appurtenances thereto located at 8100 Jeb Stuart Road, Rockville, Maryland 20854;

8.      Account No. 3802032201 at Sterling National Bank;

9.      Account No. 3802032216 at Sterling National Bank; and

10.     Account number 3852524414 at Sterling National Bank.


Dated:   New York, New York
         October 7, 2013

STROOCK & STROOCK & LAVAN LLP

By:   /s/ Curtis C. Mechling
      Curtis C. Mechling
      James L. Bernard
      Benjamin Weathers-Lowin
      Monica Hanna
      Patrick N. Petrocelli
      Nathan H. Stopper
      180 Maiden Lane
      New York, New York 10038
      Tel: (212) 806-5400

      *Attorneys for the Greenbaum, Acosta, Beer, and Kirschenbaum Plaintiffs*

SALON MARROW DYCKMAN NEWMAN & BROUDY LLP

By:   /s/ Liviu Vogel
      Liviu Vogel
      Mark Antar
      292 Madison Avenue
      New York, New York  10017
      Tel: (212) 661-7100

      *Attorneys for the Peterson Plaintiffs*

16

ZUCKERMAN SPAEDER LLP

By:   /s/  Aitan D. Goelman
        Aitan D. Goelman
        Peter Kolker (admitted *pro hac vice*)
        1800 M Street, NW
        Suite 1000
        Washington, DC 20036
        Tel: (202) 778-1800
        -and-
        Noah Solowiejczyk
        1185 Avenue of the Americas, 31st Fl.
        New York, NY 10036
        Tel: (212) 704-9600

*Attorneys for the Rubin Plaintiffs*

WIGGINS, CHILDS, QUINN & PANTAZIS,
LLC

By:   /s/ Dennis G. Pantazis
        Dennis G. Pantazis (admitted pro hac vice)
        301 19th Street North
        Birmingham, AL  35203
        Tel: (205) 314-0531

        -and-

        Timothy B. Fleming (admitted *pro hac
        vice*)
        WIGGINS CHILDS QUINN &
        PANTAZIS, PLLC
        1850 M Street, NW, Suite 720
        Washington, D.C.  20036
        Telephone: (202) 467-4489

*Attorneys for the Havlish Plaintiffs*

DLA PIPER LLP

By:   /s/ Richard M. Kremen

    Richard M. Kremen (admitted *pro hac vice*)
    Dale K. Cathell (admitted *pro hac vice*)
    Jodie E. Buchman (admitted *pro hac vice*)
    Lauren C. Genvert (admitted *pro hac vice*)
    6225 Smith Ave.
    Baltimore, MD 21209
    Tel: (410) 580-3000
    -and-
    Cary B. Samowitz
    Timothy Birnbaum
    1251 Avenue of the Americas, 27th Floor
    New York, New York  10020-1104
    Telephone:  212-335-4500

*Attorneys for the Heiser Plaintiffs*